IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA              CR No. 1:21-cr-00006-TJK-1

v.                                    Washington, D.C.
                                      Friday, December 16, 2022
DOUGLAS AUSTIN JENSEN,                9:00 a.m.

                Defendant.
- - - - - - - - - - - - - - - - x
_____

                   TRANSCRIPT OF SENTENCING
         HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the United States:      Emily W. Allen, Esq.
                            Hava A. L. Mirell, Esq.
                            DOJ-USAO
                            United States Attorney's Office
                            222 West 7th Avenue
                            Room 253
                            Anchorage, AK 99513
                            (907) 271-4724


For the Defendant:          Christopher M. Davis, Esq.
                            DAVIS & DAVIS
                            1350 Connecticut Avenue, NW
                            Suite 202
                            Washington, DC 20036
                            (202) 234-7300


Court Reporter:             Timothy R. Miller, RPR, CRR, NJ-CCR
                            Official Court Reporter
                            U.S. Courthouse, Room 6722
                            333 Constitution Avenue, NW
                            Washington, DC 20001
                            (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1              **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  Your Honor, this is Criminal

3     Matter 21-6, United States of America v. Douglas Austin

4     Jensen.

5              Present for the Government are Emily Allen and

6     Hava Mirell; present from the United States Probation Office

7     is Hana Field; present for the defendant is Christopher

8     Davis; also present is the defendant, Mr. Jensen.

9              THE COURT:  All right.  Well, good morning to

10    everyone.

11             We are here for Mr. Jensen's sentencing.

12             I have received and reviewed the presentence

13    report, the sentencing recommendation -- and sentencing

14    recommendation from the Probation Office.  I've received the

15    sentencing memoranda from the Government and the defendant,

16    including the many letters submitted on the defendant's

17    behalf, including the supplements that have been filed.

18    I've reviewed everything that's been filed on the record.

19             Are there any other documents and materials for me

20    to review?

21             MS. ALLEN:  Your Honor, we had submitted two

22    supplements, and I just want to make sure that Your Honor

23    received both of them.

24             THE COURT:  I did.

25             MS. ALLEN:  Thank you.

```
 1              THE COURT:  I did.

 2              Anything further from you, Mr. Davis?

 3              MR. DAVIS:  Your Honor, nothing further other than

 4     I don't know if Your Honor signed the order to seal.  But

 5     you received the sealed documents, also; correct?

 6              THE COURT:  Correct.  Correct.  Yes, on both sides

 7     there are documents under seal that I have received and

 8     reviewed.  Correct.

 9              All right.  Mr. Jensen, this sentencing hearing

10     will proceed in four steps.  And all the while, I want you

11     to keep in mind the seriousness of why we are here today.

12     You were found guilty at trial of committing multiple

13     federal crimes, and today's proceeding is about the

14     consequences that you'll face about your decision to commit

15     those crimes or as a result of your decision to commit those

16     crimes.

17              The first step of today's hearing is for me to

18     determine whether you and your lawyer have received the

19     presentence report and whether there are any outstanding

20     objections to that report and, if so, to resolve those

21     objections.

22              The second step is for me to determine what

23     sentencing guidelines and sentencing range applies to your

24     case based on your criminal history and considering any

25     mitigating or aggravating factors that might warrant a
```

1   departure under the sentencing guidelines manual.

2           The third step is for me to hear from the

3   Government; from your counsel; and from you, if you wish to

4   address me in determining -- for me to decide what your

5   sentence is.

6           And the last step requires me to fashion a just

7   and fair sentence in light of the factors Congress has set

8   forth in 18 United States Code Section 3553(a).  And as part

9   of this last step, I will actually impose the sentence along

10  with other required consequences of the offense.

11          So the final -- so step one regard- -- is --

12  concerns the presentence report.  The final presentence

13  report and sentencing recommendation were filed in this

14  matter on December -- let me check, yes -- December 9th.

15          Does the Government have any objection to any of

16  the factual statements set forth in the report?

17          MS. ALLEN:  We don't have any objection to the

18  factual statements.

19          THE COURT:  All right.  And are you expecting an

20  evidentiary hearing on any matter?

21          MS. ALLEN:  No, Your Honor.  I do have one

22  individual -- one witness in the case who would like to

23  address the Court, but it is not a factual --

24          THE COURT:  Understood.

25          Mr. Davis, does the defendant have any objection

1    to any of the factual statements set forth in the

2    presentence report?

3                MR. DAVIS:  No, Your Honor.

4                THE COURT:  All right.  And are you expecting an

5    evidentiary hearing on any matter?

6                MR. DAVIS:  No, Your Honor.

7                THE COURT:  All right.  Mr. Jensen, you can

8    address me from right where you are.

9                Are you fully satisfied with your attorney in this

10   case, sir?

11               THE DEFENDANT:  Yes, Your Honor.

12               THE COURT:  All right.  And have you had enough

13   time to talk with him about the presentence report and the

14   papers the Government filed in connection with this

15   sentencing?

16               THE DEFENDANT:  Yes, Your Honor.

17               THE COURT:  Okay.  All right.  I will accept the

18   facts as stated in the presentence report, and the

19   presentence report will be my findings of fact for purposes

20   of this sentencing.

21               The second step is the determination of the

22   guidelines.  The presentence report lays out the statutory

23   sentencing framework that applies in this case.  So I will

24   attempt to satisfy -- to summarize it as follows:

25               As far as the guidelines go, the presentence

1    report lays out how all the felony counts group and how the

2    highest offense level results from Count 2, obstruction of

3    an official proceeding.  I know the Government has a

4    technical issue with how that grouping took place, but I

5    think, in the end, it -- the Government at least arrives at

6    the same place the PSR does in that regard.

7         The guideline for 18 United States Code Section

8    1512(c)(2) -- that offense is found in Section 2J1.2 of the

9    guidelines.  That section provides that an offense involving

10   obstruction of justice has a base offense level of 14.

11   That's the guidelines 2J1.2(a).  Now, there are two

12   enhancements that I know -- or two specific offense

13   characteristics that the defense wants to argue that do not

14   apply -- or I guess, two and then the issue of acceptance of

15   responsibility, but at least this is how it's laid out in

16   the report.  Because the offense involved causing or

17   threatening to cause physical injury to a person or property

18   damage in order to obstruct the administration of justice, 8

19   levels are added for an offense level of 22.  Because the

20   offense resulted in substantial interference with the

21   administration of justice, 3 levels are added to get to 25.

22   And per the -- again, per the report, the defendant has not

23   clearly demonstrated acceptance of responsibility.  So

24   there's no reduction there.  So that ends up with an offense

25   level of 25 which, again, I know the Government has a, sort

1    of, technical objection to the, kind of, way the grouping

2    took place and all that, but the Government agrees at least

3    that it ends up at an offense level of 25.

4         I do know -- I do understand that the defendant

5    has objections at least on the fronts about administration

6    of justice and on whether the defendant should get

7    acceptance of responsibility.  So I'll hear from --

8    Mr. Davis, I'll hear from you on those.

9         MR. DAVIS:  Your Honor, do you want me to go to

10   the podium or can I speak from here?

11        THE COURT:  Wherever you're comfortable.

12        MR. DAVIS:  All right.

13        Your Honor, I'm not going to spend a lot of time

14   on this.  I mean, there's one lone opinion in this

15   courthouse written by Judge Trevor McFadden regarding the

16   administration of justice and the inapplicability of the

17   eight-point enhancement and the three-point enhancement

18   under 2J1.2.  I would submit on that.  I mean, his opinion

19   is pretty extensive.  I don't think it's made its way

20   through the Court of Appeals yet, but that's what we're

21   relying on --

22        THE COURT:  Okay.

23        MR. DAVIS:  -- with regard to that.

24        THE COURT:  All right.  And -- all right.  Before

25   I hear from you on -- do you want to also be heard on the

1      acceptance of responsibility point?

2              MR. DAVIS:  Very briefly.

3              Your Honor, I'm familiar with the guidelines.

4      I -- the guidelines are -- I predate the guidelines by many,

5      many years.

6              (Laughter.)

7              But I think one of the underlying principles of

8      the sentencing guidelines -- one of the underlying

9      principles of sentencing is you have to look at the

10     individual, and I think Mr. Jensen is certainly a very

11     different individual, and I think the circumstances that

12     brought him here and his belief system, I think that should

13     be factored into the guidelines in terms of deciding whether

14     he accepted responsibility.  He went to trial, but he didn't

15     contest facts.  What he did is he -- he literally went to

16     trial with the same explanation he gave to the FBI when he

17     was originally arrested.  He actually believed what he was

18     doing on that date was proper.  And I would submit that in

19     light of those facts, that it would be appropriate to give

20     him some credit for acceptance of responsibility, despite

21     the fact that he went to trial.

22              THE COURT:  All right.  Well, you are -- before I

23     hear from the Government on those two points, I'll just

24     note, you are right that sentencing is individualized.

25     There's no question about that.  And regardless of how I

1    come out on these two things -- or at least on the

2    administration of justice -- on the acceptance of

3    responsibility point, I think I can still broadly consider

4    the points you're making when I apply the 3553(a) factors,

5    for sure.

6         But let me hear from the Government -- again, you

7    can come to the podium or wherever you would like,

8    Ms. Allen -- on these two points about administration of

9    justice and acceptance of responsibility.

10        MS. ALLEN:  Thank you, Your Honor.

11        On the first two points, I'll just address them

12   together.  There is one opinion in this courthouse

13   suggesting that the two sentencing enhancements do not apply

14   in this case.  Those are -- those -- that opinion is clearly

15   in the minority, and all the other courts in this courthouse

16   to consider that have found otherwise, including Your Honor

17   in similar cases.

18        THE COURT:  It was not contested in that case,

19   though --

20        MS. ALLEN:  That's true.

21        THE COURT:  -- but that's true.

22        MS. ALLEN:  That's true.  I don't want to belabor

23   that, because I think the parties have fully briefed the

24   issues here.  It's really just a legal question.  And I

25   think it is clear -- the clear weight of authority suggests

1          that the Government's position on that is the correct one.

2                    As for the acceptance of responsibility, that is

3          more of a factual issue, and it's certainly the case that by

4          going to trial, a defendant does not automatically

5          relinquish the ability to claim acceptance of responsibility

6          and those two points, but those facts are not present here.

7          That is a rare circumstance, and there are many guideposts

8          that the Court can look to to see whether this case falls

9          within that rare circumstance.  Some examples of cases where

10         a defendant was not found eligible for the acceptance of

11         responsibility points after trial include one where a

12         defendant had testified truthfully in the grand jury before

13         his case went to trial and then elected not to plead guilty,

14         and another where a defendant declined to speak with the

15         probation officer in preparation of a presentence report.

16                   Mr. Jensen -- the only measure of any form of

17         acceptance of responsibility in this case is his interview

18         with the FBI which, in certain ways, he was truthful, but he

19         certainly wasn't asked every question or volunteer every

20         piece of information that would have been relevant to the

21         case.  The agents there didn't know that he was coming.  So

22         they had no time to prepare for any kind of interview.  He

23         wasn't asked a great number of questions that would be

24         ultimately relevant to the charges.  He hadn't been charged.

25         So the agents had no way, at that point, of knowing the

1   nuances of various elements of offenses that might be

2   charged down the road.  That's the only time that Mr. Jensen

3   has spoken to anyone in this case and has had any measure of

4   acceptance of responsibility in any way.  And at trial, he

5   did contest a number of the essential elements of each of

6   the offenses here.  So there were facts that were not in

7   dispute like there are in any trial, but there were

8   certainly a great number of facts that were in dispute,

9   including a pretty fundamental one as to whether what

10  Mr. Jensen did that was captured on video amounted to an

11  assault of Officer Goodman.  He's simply ineligible for that

12  two-level reduction under the guidelines.

13          THE COURT:  All right.  So on these two points,

14  I'll walk through why I do think I side with the Government

15  and the presentence report writer that the offense does

16  involve the administration of justice for purposes of the

17  guidelines and that Mr. Jensen's not eligible for acceptance

18  of responsibility.  I'll do the acceptance of

19  responsibility, I guess, first.

20          So the relevant note to the guideline provision on

21  this says "This adjustment is not intended to apply to a

22  defendant who puts the government to its burden of proof at

23  trial by denying the essential factual elements of guilt, is

24  convicted, and only then admits guilt and expresses

25  remorse."  So by and large, a defendant who goes to trial is

1    not eligible for this, but not -- as both parties agree and

2    as this note suggests, that's not automatic.  The note goes

3    on to say that "Conviction by trial, however, does not

4    automatically preclude a defendant from consideration for

5    such a redaction -- a reduction.  In rare situations, a

6    defendant may clearly demonstrate an acceptance of

7    responsibility for his criminal conduct even though he

8    exercises his constitutional right to a trial.  This may

9    occur, for example, when a defendant goes to trial to assert

10   and preserve issues that do not relate to factual guilt.

11   For example, to make a constitutional challenge to a statute

12   or a challenge to the applicability of the statute to his

13   conduct.  In each instance, however, a determination that a

14   defendant has accepted responsibility will be based

15   primarily upon pretrial statements and conduct."

16        So looking at what happened here, I don't think

17   acceptance of responsibility applies.  He hasn't argued

18   this, I think, directly to me, but it may be that part of

19   Mr. Jensen's motivation to go to trial stemmed from his

20   desire to preserve certain wholly legal challenges to

21   whether various statutes are applicable here, but before the

22   trial -- even -- and during his interview, he never admitted

23   that he intended to obstruct Congress's certification of the

24   Electoral College vote.  That is what the jury found, and

25   that is the core question on the 1512 charge.  In fact, I

1    think the opposite is true.  During the interview he gave,

2    he seemed to, at various times, suggest that he was present

3    at the Capitol, really, as an observer or as a witness or,

4    in his words, to give Q the credit for what was happening

5    there.  So I -- he also never admitted to assaulting Officer

6    Goodman then or at any time.  So -- and that is what the

7    jury found in this case.  So -- and then there was a

8    statement the Government highlighted in its papers in which

9    the defendant -- let me see if I can find it here -- in

10   which the defendant basically said -- he was asked, "Well,

11   would you do it all over again?"  And he essentially said --

12   let's see -- "asked if he had had any regrets about his

13   action that day, he replied, 'I don't know.  It depends on

14   the out- -- if the outcome I wanted happens.  Then it would

15   all have been worth it.'"  I don't think, then, especially

16   that -- with that statement, I can really give him credit

17   for acceptance of responsibility.  That is, as the note

18   says, a rare situation, and I don't think this is one of

19   those rare situations.

20            As far as the administration of justice issue

21   goes, it is an interesting question, and it's good that we

22   have both sides looking at this carefully to litigate it.  I

23   do think it applies.  I think the Government points to a

24   number of definitions of the relevant terms that -- let's

25   see if I can at least point out a few of them -- that are

1    broad enough to cover -- here it is -- that are broad enough

2    to cover the proceeding here and the offense here.  They

3    are, for example, "justice" as being the fair and proper

4    administration of laws.  So I, you know -- that, in

5    particular, jumped out at me as a definition that's broad

6    enough to encompass the administration of justice here.  And

7    I've held on a number of occasions that the proceeding here

8    was, kind of, quasi-judicial in its nature.  And so I do

9    think that some of those definitions -- especially the one

10    of "justice" that the Government included in its papers --

11    would cover the fair administration and prop- -- "the fair

12    and proper administration of laws" covers what was happening

13    here -- was happening there at that proceeding.

14         I also think it's important to look at the

15    structure of 2J1.2, that guideline.  I mean, the guideline

16    is entitled "Offenses Involving the Administration of

17    Justice."  And it applies clearly to some offenses that

18    don't fit the more narrow version of this offense that those

19    who would argue the specific offense characteristic doesn't

20    apply -- that they would have to rely on.  So I think the

21    structure of -- the structure and indeed the name of that

22    guideline -- the structure and context really suggests that

23    it applies, as well.

24         I think the commentary is a little bit more of a

25    mixed bag.  It doesn't specifically, maybe, reference a

1    proceeding like the one we had here, but I think it does

2    suggest a broader reading of those terms in general, even if

3    it doesn't suggest that it would -- that -- it doesn't give

4    an example that's exactly like a certification of

5    Electoral -- of an Electoral College vote.  Most judges on

6    this court, as the parties indicated, have applied this

7    guideline in these circumstances.  There's only one judge

8    who came out the other way.  And I think, at the end of the

9    day, the argument that "administration of justice" means,

10   sort of, something narrower than would be -- that would be

11   applicable here is really just based on the fact that yes,

12   ordinarily -- I think what Judge McFadden found; that it had

13   to apply to a proceeding that determines rights or

14   obligations -- determines a party's rights or obligations.

15   Look, that is going to be the case probably almost in every

16   occasion.  I think the thing about the certification of the

17   electoral vote is it's just such a unicorn.  It's such an

18   unusual proceeding that it may be the, sort of, exception

19   that proves the rule.  So I think these terms, for all the

20   reasons I've said, are broad enough to capture this, even if

21   many of the examples of proceedings that would be captured

22   by this do have features such as determining rights and

23   obligations of a party.

24            After all of that, let me just say this.  I also

25   think, particularly in this case, it really doesn't

1    matter -- so I am going to apply it for all those reasons.

2    I'll also just say in this case, I don't think it really

3    matters that much because the reality is, on the facts here,

4    given the array of conduct here and given the importance and

5    the significance of the proceeding of certifying the

6    Electoral College votes, I would vary upward -- even if this

7    didn't apply, I would vary upward when considering the

8    nature of the offense the same amount that this guideline

9    would have me add to the offense level.  It doesn't mean I

10   might not vary downward based on other 3553(a) factors even

11   below that, but in looking at the nature of the offense, I

12   would vary upward the same way the guideline would operate

13   even if, as some -- in some technical way, it didn't apply.

14           So there are my thoughts on that, and we -- what

15   we -- what it all nets out to is an offense level of 25

16   after consideration of those specific offense

17   characteristics.

18           The next step in calculating the relevant

19   guideline is the defendant's criminal history category.  The

20   PSR calculates that Mr. Jensen has one criminal history

21   point which places him, though, in Criminal History Category

22   I of the sentencing guidelines.  And so given an offense

23   level of 25 and a criminal history category of I, the

24   guidelines range for the felony counts, anyway, involved is

25   57 months to 71 months.

```
 1              Other than those we've discussed, are there any
 2    objections to this sentencing guideline calculation?
 3              MS. ALLEN:  No, Your Honor.
 4              MR. DAVIS:  No, Your Honor.
 5              THE COURT:  All right.  And having determined the
 6    applicable guidelines sentence, the next step is for me to
 7    consider any departures within the guidelines.  I think the
 8    parties are -- well, I think, Mr. Davis, you're going to be
 9    asking for a variance, for sure.  But just to make sure I
10    don't overlook anything, is either side requesting a
11    departure?
12              MS. ALLEN:  No, Your Honor.
13              MR. DAVIS:  No, Your Honor.
14              THE COURT:  All right.  Very well.
15              So let me lay out, assuming we are in the
16    guidelines place that I laid out, what the applicable
17    penalties are other than incarceration; that is, supervised
18    release, fines, and forfeiture.
19              So as far as incarceration goes, for Count 1, the
20    maximum term of imprisonment is 5 years; for Count 2, the
21    maximum term of imprisonment is 20 years; for Count 3, the
22    maximum term of imprisonment is 8 years; for Counts 4 and 5,
23    the maximum term of imprisonment is 10 years; and for Counts
24    6 and 7, the maximum term of imprisonment is 6 months.
25    That's under the statute.  Under the guidelines, as we've
```

1    already mentioned, for Counts 1 through 5, based on the

2    total offense level of 25, criminal history category of I,

3    the guideline imprisonment range is 57 months to 71 months.

4    For Counts 6 and 7, the guidelines do not apply.

5           With regard to supervised release, for Counts 1

6    through 5, under the statute, I may impose a term of

7    supervised release of not more than three years under the

8    relevant statute.  Of course, again, for Counts 6 and 7,

9    those statutes do not apply.  For the guidelines for Counts

10   1 -- for Counts 1 and 3, since the offense is a -- these

11   are -- offenses are Class D felonies, the guidelines range

12   for a term of supervised release is one year to three years,

13   and also, for Counts 2, 4, and 5, again, the guidelines

14   range is one year to three years.  So for 1 through 5, the

15   guidelines range is one years to three years -- one to three

16   years' supervised release.  And, again, for Counts 6 or 7,

17   supervised release is not contemplated.  So these do not

18   apply.

19          For probation, for Counts 1 through 5, the

20   defendant is eligible for not less than one nor more than

21   five years' probation under the statute.  For Counts 6 and

22   7, the defendant is eligible for up to five years'

23   probation.  As far as the guidelines go, for Counts 1

24   through 5, the defendant would be ineligible for probation;

25   and for Counts 6 and 7, again, the guidelines do not apply

1    to those misdemeanors.

2              As far as fines go, for Counts 1 through 5, the

3    maximum fine is $250,000.  For Counts 6 and 7, the maximum

4    fine is $5,000.

5              And as far as special assessments go, for Count

6    1 -- Counts 1 through 5, a special assessment of $100 is

7    mandatory as to each count; and for Counts 6 through 7, a

8    special assessment of $10 is mandatory as to each count.

9    Under the guidelines, Counts -- for Counts 1 through 5, the

10   fine range is from 20,000 to 200,000.  And for Counts 6 or

11   7, again, the guidelines do not apply.

12             So have I accurately stated the statutory and

13   guidelines framework under which we're operating in regard

14   to this case, Ms. Allen?

15             MS. ALLEN:  Your Honor --

16             THE COURT:  Is -- have I stated -- have I

17   accurately stated the framework?

18             MS. ALLEN:  Yes, Your Honor.  We have no

19   objection.

20             THE COURT:  All right.  Mr. Davis?

21             MR. DAVIS:  The same, Your Honor.

22             THE COURT:  All right.  Next, we turn to

23   consideration of the statutory factors under 18 United

24   States Code 3553(a) and the defendant's opportunity to

25   speak.

1          So what I have to do now is consider the relevant

2    factors that Congress set out in 18 United States Code

3    3553(a) and ensure I -- that I impose a sentence sufficient

4    but not greater than necessary to comply with the purposes

5    of sentencing.  These purposes include the need for the

6    sentence imposed to reflect the seriousness of the offense,

7    to promote respect for the law, and to provide just

8    punishment for the offense.  And this sentence should also

9    afford adequate deterrence to criminal conduct, protect the

10   public from future crimes of the defendant, and promote

11   rehabilitation.  And in addition to the guidelines and

12   policy statements, Congress has told me I have to consider,

13   again, the nature and circumstances of the offense; the

14   history and characteristics of the defendant; the need for

15   the sentence imposed to comply with the purposes I just

16   mentioned; I have to consider the kinds of sentences

17   available; the need to avoid unwanted sentence disparities

18   among defendants with similar records who have been found

19   guilty of similar conduct; and I have to consider the need

20   to provide restitution to victims of the offense.

21        So with all of that laid out, I'll hear the

22   Government on application of the 3553(a) factors and to make

23   a sentencing recommendation.

24        MS. ALLEN:  Your Honor, Doug Jensen wanted to be

25   the poster boy of the insurrection.  When he made that

1    decision, he knew that this was not a costume parade.  When

2    he made that decision, he knew that people were going to the

3    Capitol armed with assault rifles and weapons.  He knew the

4    Mayor of Washington, D.C. was afraid of the consequences of

5    the riot.

6            At the trial, we didn't discuss very much

7    Mr. Jensen's wish that he would become the face of the

8    revolution because those kind of comments are so

9    inflammatory that they might risk that the jury would render

10   a verdict that was based on passion and not on the facts,

11   but it is important at the sentencing phase to talk about

12   that motivation.  That is highly relevant to the sentencing

13   in this case, because Mr. Jensen intentionally made himself

14   an inspiration and a leader to the people who followed him

15   into the Capitol.  That was his plan going forward, and he

16   executed that plan pretty perfectly.  The officers in the

17   Ohio Clock Corridor -- the ones who testified here at trial

18   and other officers on the scene -- routinely described

19   Mr. Jensen as the leader.  And we know from testimony at

20   trial and we know from video evidence, we know from other

21   defendants who have pled guilty in this District that dozens

22   of people did, in fact, follow him up those stairs and

23   contribute significantly to the threatening nature of what

24   happened on that day.

25           For Mr. Jensen, this was about politics as much as

1    it was about anything.  He did not believe that the

2    Insurrection Act was inevitable.  In fact, he told the FBI,

3    quote, that he was "pushing for the Insurrection Act."  He

4    was "trying to fire up a revolution."  He noted before he

5    went to the Capitol that a Democrat winning an election in

6    Georgia the day before January 6th was something that would

7    enrage the crowd ahead of the riots to fire them up for

8    January 6th.

9         And in order to get what he wanted, Mr. Jensen

10    assaulted a Capitol Police officer.  That puts this case in

11    a different category than many of the other cases that have

12    been before this Court.  He forced Officer Goodman to

13    retreat.  Officer Goodman threatened to shoot Mr. Jensen.

14    His hand on -- was on his weapon and he directly told

15    Mr. Jensen that he was going to have to use it, but

16    Mr. Jensen knew he had the power and he used the power that

17    he had at that moment.  He gambled on the fact that Officer

18    Goodman wouldn't pull the trigger.  Mr. Jensen saw that

19    Officer Goodman was alone and outnumbered, and he knew there

20    was no way that Officer Goodman could shoot him or he would

21    be overrun by the mob that was behind Mr. Jensen.  Officer

22    Goodman, even if he had wanted to, simply wouldn't have had

23    enough ammunition to do anything meaningful to stop what was

24    going on.

25         Fortunately for Mr. Jensen, Officer Goodman was

1    heroic that day and he did no such thing, but it was only

2    because Mr. Jensen gambled on that fact that he was able to

3    advance and force Officer Goodman to retreat.  Mr. Jensen

4    absolutely knew that Mr. -- that Officer Goodman was afraid.

5    He told the FBI that at the moment he began chasing Officer

6    Goodman up the stairs, quote, "he showed a lot of fear and

7    started running."  And so Mr. Jensen explained to the FBI he

8    started running after Officer Goodman at that moment.

9           This case is different than many of the other

10    January 6th cases because of this assault.  The rioters who

11    assaulted uniformed police officers on that day are

12    sentenced more harshly than those who didn't and that, of

13    course, they should be.  The riot that day could have turned

14    into something far more deadly than it was, and actions like

15    Mr. Jensen's would have created that deadly scenario, and

16    that's why it's so important here that the punishment

17    reflect the seriousness of the conduct.

18           Mr. Jensen has never taken responsibility or made

19    himself accountable for his own actions and the violence

20    that he inspired in others -- that he intentionally inspired

21    in others.  When he spoke to the FBI, it was on his own

22    terms.  It was his own timing.  He gave them a narrative,

23    but he never acknowledged in that interview, as Your Honor

24    has already pointed out, that he committed a crime.  He

25    denies that he intended to obstruct Congress's certification

1    of the election and he denies that he assaulted Officer

2    Goodman as a mob was chasing him through the halls.  He has

3    never taken any responsibility for the devastating impact

4    that his actions had on the officers he assaulted and

5    confronted that day and on the country.  He's had two years

6    to reflect on what he did.  As he himself put it, he's had

7    more than enough time to dwell upon his actions and, still,

8    he has never reflected on or admitted what he did.

9           Mr. Jensen may get up today and apologize to the

10    Court.  That is not a measure of his acceptance of

11    responsibility.  That is a measure of his wish for a lenient

12    sentence in this case.  His inability to accept

13    responsibility extends beyond this case and into his

14    history.  Mr. Jensen's criminal record and his statements

15    about his criminal record in this case show that he is

16    consistently reluctant to take responsibility for any of his

17    wrongful actions.  In 2005, he was convicted of a drug

18    distribution offense.  As a result of that offense, his wife

19    and he lost custody of their children.  This is an

20    indication of the seriousness of that offense.  Not much is

21    known about the facts of that case other than what the

22    defendant has reported, but in reporting what is fairly

23    obviously a pretty serious allegation that had such dire

24    consequences for the family, his explanation seems defensive

25    and dismissive about the seriousness of the conduct.  He

1    says he simply was planning to give some marijuana to a

2    friend at his house and that he smoked in the basement of

3    the house where his children were.

4         In 2015, he was convicted of a domestic assault

5    offense, and his explanation for that is simply that he

6    snapped; that he had been drinking too much and, apparently,

7    that the injuries that he caused his wife were just

8    collateral damage to an otherwise excusable event.

9         In 2018, in an assault charge that arose from a

10   fight with his niece's boyfriend, Mr. Jensen claims that it

11   was the boyfriend who assaulted him, and yet it was

12   Mr. Jensen who was charged with assault in that case.

13        In 2019, a very troubling incident involving his

14   neighbors.  I'd actually like to read from the PSR that

15   describes what happened that day or that -- in that

16   incident.  And this is 2019, fairly recent events, an arrest

17   for which the defendant was not convicted because the victim

18   refused to cooperate.  But as the PSR describes, Mr. Jensen

19   posted in a Facebook group that a neighbor's post about a

20   dog on the loose in the neighborhood did not belong in that

21   Facebook group.  In response to that infraction or that

22   perceived infraction, Mr. Jensen messaged the neighbors

23   multiple times.  He stated he was going to their address.

24   He sent a screenshot of their address.  He made comments

25   calling his neighbor obscenities and his neighbor's husband

1    other obscenities.  They asked him to stop and he continued

2    to message the neighbor.  He commented to the neighbor that

3    he was minutes away and that he was not fucking playing.

4    This is all in -- set forth in Page 21 of the presentence

5    report at Paragraph 81.  He was charged with harassment in

6    the third degree.  Now, that incident did not result in a

7    conviction.  It doesn't score on his criminal history, but

8    it's certainly relevant to his conduct, and it is in stark

9    contrast to some of the letters that Mr. Jensen submitted in

10   support of his request for release pretrial back in the

11   spring of 2021 that have been submitted to the Court for

12   sentencing here where other neighbors have very different

13   impressions of Mr. Jensen.  That response came from a

14   neighbor's post about a dog that was on the loose in the

15   neighborhood.

16          Even since then, even more recently, in 2022, he

17   admitted that while in custody, he was fighting, and his

18   excuse for that behavior was that he was simply protecting

19   himself.

20          In each one of these situations, those

21   explanations may be true, but what it adds up to is an

22   apparent failure to take responsibility for a number of bad

23   behavior over a number of years.  In fact, in this case, he

24   violated the conditions of release very shortly after he was

25   released from custody, and those are conditions which he

1    himself had proposed to the Court.  So he has had a

2    demonstrated difficulty complying with the Court's

3    requirements and conducting himself in society in a way that

4    is acceptable.

5              THE COURT:  I take your point on the conditions.

6    Obviously, for things he was convicted of, it is -- that is

7    what it is.  On the other incidents you've raised -- I mean,

8    you're -- you were arguing them as part of a bucket of

9    Mr. Jensen's not taking responsibility.  That presumes that

10   he was responsible; right?  I mean, I don't -- I can't

11   adjudicate, for example, the incident while he has been

12   incarcerated.  He says he was defending himself.  You don't

13   have any evidence that he wasn't.  So if that's the case, I

14   really can't consider that as he failed to take

15   responsibility for that if indeed he is right; right?

16             MS. ALLEN:  Well --

17             THE COURT:  I mean, isn't that fair?

18             MS. ALLEN:  Well, Your Honor, in the 2019 incident

19   with the cyberstalking, he simply -- he called it, quote,

20   "simply a heated exchange on a Listserv."  So that is a,

21   sort of, different example of -- it's not that there's a

22   dispute about the veracity of the charges, but that --

23             THE COURT:  Well, the charges -- he was never

24   convicted.  I mean, it -- I take your -- I guess I -- you

25   can point out the conduct, but as far as, like, saying,

1        "Well, he didn't take responsibility," that assumes that he

2        was, in some way -- well, I guess it doesn't depend on him

3        being adjudicated to be in the wrong, but you would say,

4        just from that conduct, that's wrongful conduct.  I --

5        maybe, that's a little different than the jail incident,

6        then.

7                MS. ALLEN:  Maybe that's a little different than

8        the jail incident, but, you know, he -- the jail decided

9        that as a result of his conduct, he was not entitled to

10       something like 27 days of good time credit, you know?  Like

11       I said, in each incident, it may be that he wasn't

12       responsible, but as you add these up together over the

13       course of a lifetime, it is -- it seems to be a pattern, and

14       it certainly has repeated itself here in this case where he

15       has resolutely refused to take responsibility for the

16       seriousness of what he did.

17               It's very difficult to reckon with the tragedy of

18       a childhood like Mr. Jensen's.  His background, as Mr. Davis

19       has pointed out, might help to explain how a smart, capable,

20       productive person like Mr. Jensen might be susceptible to

21       the ideas that are espoused in QAnon posts, but even if that

22       helps to provide a way to explain how he came to those

23       beliefs, that background just simply can't excuse what he

24       did in this case.  It does not provide an excuse for

25       Mr. Jensen driving across the country with people he knew

1    would be armed and packing heavy to attend an event that he

2    knew -- and furthered -- was designed to overthrow the

3    results of a peaceful election.

4            This is also not how Mr. Jensen described his

5    motivations when he talked about the offense with the FBI

6    which was very shortly after the offense, just a couple days

7    later, and which was uncounseled: his, sort of, unfiltered

8    description of what happened.  He told the FBI that he was

9    there to help overturn what he saw as a stolen election.  He

10   did not explain his behavior as something that was relating

11   to an effort to stop a cabal of pedophiles.  His decision,

12   instead, to storm the Capitol was to stop the steal of an

13   election.

14           Your Honor will recall the testimony from

15   Inspector Thomas Lloyd from the U.S. Capitol Police.

16   Inspector Lloyd is responsible for 350 U.S. Capitol Police

17   officers.  He's worked for the Capitol Police for something

18   like 32 years.  He's submitted a letter to the Court in this

19   case.  And he's here today and would like to address Your

20   Honor, and I'd like to give him a moment to do that.

21           THE COURT:  All right.  Very well.

22           INSPECTOR LLOYD:  Good morning, Your Honor.

23           THE COURT:  Good morning.

24           INSPECTOR LLOYD:  Well, my name is Inspector Tom

25   Lloyd from the United States Capitol Police.  Thank you for

1    the opportunity to address the Court.

2          The January 6th riot changed my life forever.  The

3    legislative branch of government had not seen an attack like

4    that since August 24th, 1814, when the British broke into

5    the United States Capitol building and burned it.  I'm

6    responsible for the safety and security of the United States

7    Capitol building on a daily basis.  The people who work in

8    the building are my colleagues, to include the 350 police

9    officers assigned to me.  The mob attacked my colleagues on

10   January 6th.  The riot was an intentional violent attack

11   against my officers that started at Peace Circle.  We did

12   not attack the mob.  The mob attacked us.

13          There were many leaders of the mob throughout the

14   day.  The defendant in this case led the mob inside the

15   Senate wing of the United States Capitol building up to the

16   main entrance to the Senate floor, threatening the entire

17   United States Senate, the vice president, and my personnel.

18   Thankfully, the defendant was able to walk out of the

19   Capitol building on January 6th.  He can thank Officer

20   Goodman.  If Officer Goodman had not led the defendant and

21   the rest of the mob away from the Senate lobby and an

22   attempt was made to breach those doors, there would have

23   been tremendous bloodshed.  Several rioters would have been

24   carried out of the building if not for the quick thinking of

25   Officer Goodman.

1          Many of my officers were not as lucky as the

2     defendant.  Several of my officers had to be carried out of

3     the Capitol building on January 6th due to injuries.  Some

4     have returned to a full-duty status, others are on a

5     restricted-duty status, and a few are -- were not permitted

6     to return at all due to the severity of their injuries.  Two

7     Capitol Police officers perished as a result of the riot.

8     Officer Brian Sicknick faithfully served the United States

9     Capitol Police for 13 years.  He fought valiantly for

10    several hours on January 6th.  He died suddenly at 8:30 p.m.

11    while returning to the office in the United States Capitol

12    building not far from where the defendant led the mob

13    earlier in the day.  His body survived an additional day

14    because his fellow officers worked so hard to keep him alive

15    so his family could say goodbye in person on January 7th.

16    Despite the official medical report, there was nothing

17    natural about the way Officer Sicknick died.  He was 42

18    years old.  Officer Howie Liebengood perished two days later

19    when he took his own life.  It was tough enough to bury any

20    of my colleagues, but when the call is a suicide, it makes

21    it that much more heartbreaking.  Officer Liebengood

22    faithfully served that department for 16 years.  He was 51

23    years old.

24          The ramifications of January 6th will affect all

25    my personnel for the rest of their lives.  As a result of

1    the riot, 20 percent of my team separated from the

2    department.  The mob leaders for January 6th should be

3    ashamed.

4              Thank you for the Court's time, Your Honor.

5              THE COURT:  Inspector Lloyd --

6              INSPECTOR LLOYD:  Yes?

7              THE COURT:  -- come on back to the podium.  Let me

8    just take this opportunity to thank you and all your

9    officers for your service on January 6th, but before then

10   and after then.

11             INSPECTOR LLOYD:  I appreciate it.  Thank you,

12   Your Honor.

13             THE COURT:  Yes, sir.

14             Anything more, Ms. Allen?

15             MS. ALLEN:  Just briefly, Your Honor.

16             THE COURT:  Sure.

17             MS. ALLEN:  Thank you.

18             Mr. Jensen was convicted of assaulting Officer

19   Goodman, but, of course, as we know, as we saw throughout

20   trial, his actions had a great impact on many more officers

21   than just Officer Goodman.  The sentence in this case needs

22   to reflect the seriousness of the conduct.  It needs to

23   address many factors.  This case involves extraordinary

24   mitigating factors and it involves extraordinary aggravating

25   factors.  The Government's asking for a sentence right in

1    the middle of the guideline range of 64 months which, I

2    think, is the only way to capture all of those both

3    aggravating and mitigating circumstances here.  And the

4    sentence in this case needs to address other factors besides

5    the history and characteristics of this defendant.  We need

6    to take great -- a great deal into account of the conduct he

7    engaged in on that day.  We can't be a society if we don't

8    respect these basic rules, and Mr. Jensen absolutely knew

9    that even as he acted on January 6th.  We need to hold

10   people accountable for behavior that is this far outside of

11   the bounds of what is tolerable in a democratic society.

12              Thank you, Your Honor.

13              THE COURT:  All right.  Thank you.

14              Mr. Davis?

15              MR. DAVIS:  Thank you, Your Honor.

16              Your Honor, first, I would like to clear up a

17   misconception about this 2015 domestic assault case.  That

18   did not involve Mr. Jensen's wife.  I have the records for

19   that.  That involved an individual by the name of Thomas

20   Huntley [ph].

21              THE COURT:  I understand from -- I understand, I

22   think, from the -- well, make whatever representations you

23   would like --

24              MR. DAVIS:  Certainly.

25              THE COURT:  -- but I think I pick that up from

1    the -- from what I already have, but please proceed.

2                MR. DAVIS:  And the other two incidents, which

3    were never prosecuted, the one involved a niece of his.  And

4    if you read the presentence report, they obtained the police

5    report on that offense from the Southern District of Iowa.

6    It was the other man that gouged Mr. Jensen's eyes out and

7    attacked him with a knife, at which point, they both

8    separated, but Mr. Jensen came to the aid of his niece who

9    was being abused by this individual.  And I stand by my

10   representations in my memo about the exchange over the

11   neighborhood Listserv.  That is nothing more than a heated

12   exchange over the Listserv.  And, again, that was an

13   incident that was not prosecuted.  And I think it's unfair

14   to characterize him as a wild and violent individual based

15   on the representations that were made.  I just don't think

16   it -- I don't think it's a fair characterization.

17               I do have some representations I wanted to make

18   under seal, and I don't know how Your Honor wants to do

19   that.  Normally, we come up to the bench and do a sidebar

20   or -- we have a lot of people in the courtroom.  I just

21   don't under- -- I -- so I defer to the Court on how you

22   would like me to do this.

23               THE COURT:  If I had known, we could have had the

24   little headphones out, but we don't have them right now.

25   Let's see.  I assume, again, it involves some of the matters

1   that you've already submitted under seal --

2          MR. DAVIS:  It does, Your Honor.

3          THE COURT:  -- that -- at least -- and so I

4   understand the basis for that and agree it should be under

5   seal, given the content of that.  Well, unfortunately, I

6   don't know of any other easy way to do this other than to

7   clear the courtroom.  I, you know -- if I had -- if we had

8   known, we could have made the little headsets available and

9   that would be easy.  Do you want to just wait until the end

10  to make those representations?

11         MR. DAVIS:  I can do that.

12         THE COURT:  That way, we can do everything but

13  that, clear everyone out, and bring everyone back in.

14         MR. DAVIS:  Certainly.

15         I stand by my representations that he never denied

16  what he did, and when he went in to meet with the FBI, I

17  don't think the FBI -- and, certainly, we heard from

18  their -- one of the agents during his testimony during the

19  pretrial hearings.  They did not appear to be hapless and

20  untrained individuals.  They seemed highly trained, and they

21  knew exactly what they were doing, and they met with

22  Mr. Jensen for hours on end.  And --

23         THE COURT:  They --

24         MR. DAVIS:  -- I don't think the -- his statements

25  can be anything but characterized as brutally honest.  I

1    mean, he -- even when he ran into trouble with Pretrial

2    Services for disobeying Your Honor's order, which no one

3    mentioned but I'm certain Your Honor recalls, again, he's

4    brutally honest.  I think that's the one characteristic that

5    everyone can depend on Mr. Jensen for.  When he says

6    something, he's honest about it.  He did not testify falsely

7    at trial.  He did not get up there and deny that he did

8    these things, not that he could possibly do that, given the

9    video evidence, but nonetheless there have been a number of

10   trials in this courthouse where individuals have got up and

11   told the strangest stories imaginable; that --

12              THE COURT:  Correct.

13              MR. DAVIS:  -- Mr. Jensen did not do that.  And,

14   unfortunately, he believed in the reasons that led him to

15   the Capitol.  He didn't destroy any property.  He crawled

16   through a window.  He didn't break that window out.  He

17   didn't pull anything down when he was in there.  He didn't

18   touch anyone.  Even -- and the only thing I can think of --

19   the closest physical contact that I can think of that

20   occurred during the events inside the Capitol -- and, again,

21   I'm focusing on Officer Goodman here -- was when he was

22   going up the stairs behind Officer Goodman and Officer

23   Goodman pushed him back.  Mr. Jensen did not react.  He did

24   not lash out.  And I think that --

25              THE COURT:  He did have the scuffle in the

```
 1    rotunda.
 2              MR. DAVIS:  Well, that -- the scuffle in the
 3    rotunda, if you look at those -- if you look at that
 4    videotape closely, one of the officers came up behind him
 5    and gave him a shove in the lower back, and he was upset
 6    about that --
 7              THE COURT:  Okay.
 8              MR. DAVIS:  -- and he was telling them that they
 9    shouldn't do that; that they're not doing their job
10    properly.
11              THE COURT:  Fair enough.  They were trying to
12    clear the rotunda.  So --
13              MR. DAVIS:  But he -- but, again, he did not touch
14    anyone.  And I think that's significant.  I mean, unlike
15    many of the individuals that have received sentences of five
16    years plus, they -- hockey sticks, poles --
17              THE COURT:  Your point -- your overall point is
18    well taken.
19              MR. DAVIS:  So --
20              THE COURT:  The -- he did not have -- he did
21    not -- well, I can't say he did not have -- it -- he did not
22    deploy a weapon against anyone actively --
23              MR. DAVIS:  He did not deploy --
24              THE COURT:  -- and he did not, you know -- now,
25    he, you know -- the jury found that he assaulted Officer
```

```
1    Goodman.  For sure, they did.  But it was not of the same

2    character as some of the other assaults that have been

3    prosecuted, and are being prosecuted, in this courthouse.

4            MR. DAVIS:  It was an assault that did not involve

5    physical contact.

6            THE COURT:  I -- understood.

7            MR. DAVIS:  I think that's the best way to

8    characterize it.

9            THE COURT:  That is accurate.

10           MR. DAVIS:  And I think that's important, because

11   I don't think this man has anything in his history to

12   indicate that he's a violent individual, and I will address

13   that domestic assault when I speak to you out of the public.

14           THE COURT:  I under- -- I think I understand the

15   point you're going to make, but yes.  Fair enough.

16           MR. DAVIS:  I would ask Your Honor, in sentencing

17   Mr. Jensen, to take into consideration the many COVID

18   lockdowns that he's endured while he's been incarcerated.

19   Each time he was incarcerated, he would spend up to 14 days

20   in isolation 23 hours a day with 1 hour out without any

21   contact with individuals.  That includes in Iowa; that

22   includes in Oklahoma; that includes coming to D.C.; that

23   includes going to Lewisburg; that -- and some of the other

24   judges have found that to be an appropriate factor to take

25   into consideration when deciding whether to impose any
```

1    variance in light of the unusual restrictive nature of the

2    lockdowns that have taken place during COVID.

3            And I think even more troubling for me is, since

4    he's been at the facility in Old Town Alexandria, which is a

5    very well-run jail; however, Mr. Jensen has been in 23-hour

6    lockdown at that facility since he arrived there in August.

7    He's out for one hour a day, and that hour comes up at all

8    different times.  It can come up in the middle of the night;

9    it can come up in the middle of the morning.  It's just --

10   and it's been that way since he's been there.  And these are

11   conditions that most pretrial defendants do not have to

12   endure.  And I would ask Your Honor to take that into

13   consideration along with the fact that I don't think it's

14   particularly healthy from a mental health standpoint to

15   incarcerate individuals like this.  I think it's --

16   particularly if you have someone that is predisposed to

17   mental health issues.  I just don't think it's good.

18           Mr. Jensen comes before this Court with a very

19   unusual background.  He's very different than other

20   individuals, and I don't say that to have anyone shed tears

21   for him or to totally excuse his actions, but I think his

22   actions -- that -- his actions, and at -- at their core,

23   were supplied by a catalyst that exists in his world that

24   doesn't exist in many others.  He behaved bizarrely on

25   January 6th.  He was not there with a big sign advocating

1    the overthrow of government.  He was there with a big Q on

2    his T-shirt because he wanted his perceived hero, for lack

3    of better words, to get credit for his presence at the

4    Capitol on that day, but, again, he didn't harm anyone.

5         I think he needs assistance to come to grips what

6    he has buried for a very long time.  He's a young man.  He's

7    middle- -- he's not even middle-aged.  I mean, he's a young

8    man, and I think he needs assistance, and I think he

9    understands that now.  I think he's had a lot of time to

10   reflect.  I would ask Your Honor to impose a substantial

11   variance in light of some of the factors I'm going to

12   address momentarily.

13        THE COURT:  All right.  And can you just -- I'll

14   let you characterize it however you would like, but just

15   however you would like to characterize just the nature of

16   what we're going to talk about under seal to give some

17   public description of why it needs to be under seal, just

18   characterizing it however you would like to, but just so

19   there's an understanding of what we're going to talk about.

20        MR. DAVIS:  The best characterization I can put

21   together regarding Mr. Jensen's childhood is that he had a

22   childhood of horrors which were totally out of his control

23   that began in infancy for him.  I hired -- I didn't hire --

24   I actually had a class from Drake University Law School that

25   devoted the whole semester to Mr. Jensen's case.  I pulled

```
 1    every medical record, every school record, every social

 2    service record, every institutional record and mental health

 3    record involving him, his mother.  I interviewed every

 4    family member.  I mean, literally, I prepped Mr. Jensen's

 5    case like it was the death penalty case, and I was shocked

 6    at what I saw, and I think that the context of his childhood

 7    influenced his belief system, and I think that it's a proper

 8    factor for Your Honor to consider in sentencing him, but --

 9    and that -- and in the same vein, I don't think it's a

10    proper topic to air publicly.

11             THE COURT:  It's his background and his health,

12    including his mental health?

13             MR. DAVIS:  That's correct, Your Honor.

14             THE COURT:  All right.  And I assume the

15    Government does not object to me hearing about this --

16    hearing argument on this under seal.

17             MS. ALLEN:  No, Your Honor.  I appreciate your

18    request for an explanation of the topics.

19             THE COURT:  Mm-hmm.  All right.  So what we'll do

20    is proceed -- let me just see.  Is Mr. Jensen going to

21    address me as part of --

22             MR. DAVIS:  Court's indulgence?

23             THE COURT:  -- our proceeding today?  All right.

24             (Brief pause.)

25             MR. DAVIS:  Very briefly, Your Honor.
```

```
 1              THE COURT:  All right.  I'd like to get everything
 2    but the under-seal matters out of the way, and then we can
 3    come back and I'll impose sentence.
 4              THE DEFENDANT:  Your Honor, I just wanted to say
 5    that, you know, I can't change my past.  I can just look to
 6    the future.  I don't intend on being involved in the
 7    judicial system after this, and I would like to go back to
 8    being a family man and just back to my normal life before I
 9    got involved in politics.
10              THE COURT:  All right.  Very well.  Thank you,
11    sir.
12              Anything else before we go into the under-seal
13    matters?  I just want to make sure -- anything else the
14    Government wants to -- is there anything else the Government
15    wants to --
16              Well, Mr. Jensen, will -- I mean, Mr. Davis, will
17    there be anything other than the under-seal matters, then?
18              MR. DAVIS:  No, Your Honor.  That --
19              THE COURT:  All right.
20              MR. DAVIS:  That will be it.
21              THE COURT:  Ms. Allen, is there anything further
22    the Government wants to -- any other point the Government
23    wants to make before we go into the -- under seal?
24              MS. ALLEN:  No, Your Honor.  Thank you.
25              THE COURT:  All right.  So let's clear the
```

1    courtroom.  I do find, under the relevant -- I -- based on

2    the representations, proceeding under seal is appropriate at

3    this point.  So if we can clear the courtroom, I'll hear you

4    on that -- those matters.

5              (Brief pause.)

6              MR. DAVIS:  Your Honor, may Mr. Jensen's wife

7    remain in the courtroom?

8              THE COURT:  Yes, she may.

9              (Brief pause.)

10             And --

11             MR. DAVIS:  Thank you, Your Honor.  I apologize.

12             THE COURT:  It's all right.  Hold on one second

13   until we have the --

14             (Brief pause.)

15             All right.  And there's --

16             THE DEPUTY CLERK:  The --

17             THE COURT:  There's just one other --

18             THE DEPUTY CLERK:  The blinders are right on the

19   left -- your left-hand side at the wall.

20             (Brief pause.)

21             (Following proceedings under seal:)

22   ████████████████████████████████████████████

23   ████████████

24   ████████████████████████████████████

25   ████████████████████████████████████████████████















1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17          (Following proceedings in open court:)

18          THE COURT:  All right.  If there's nothing

19    further, Mr. Davis, you can return to your seat.

20          MR. DAVIS:  Your Honor --

21          THE COURT:  Is there anything else you wanted to

22    mention?

23          MR. DAVIS:  Oh, just a couple of things.

24          THE COURT:  Please.

25          MR. DAVIS:  I just wanted to point out that

1    Mr. Jensen did not arrive at the Capitol dressed for combat.

2    He was not wearing goggles; he was not wearing a gas mask;

3    he didn't have a bulletproof vest.  He was not armed for

4    battle.  He didn't have a pole; he didn't have a hockey

5    stick; he didn't have a gun.  He had a pocketknife on him,

6    and that pocketknife is always on him.  And, actually, the

7    only reason anyone even knew he had a pocketknife on him is

8    when he went in to meet with the FBI, he told them he had a

9    pocketknife that day and he said, "I have it with me today."

10    It's a knife that he used -- a pocketknife that he carries

11    during the course of his job as a union laborer.  He did not

12    physically harm anybody on that day.  I know Your Honor has

13    pointed out that there are some facts that indicate he may

14    have been leading other individuals.  I would submit

15    nine-tenths of what Mr. Jensen did on that day was drama and

16    it can be pretty much summed up with, "I wanted to be the

17    poster boy.  That's why I wore this T-shirt.  I wanted Q to

18    get credit for it."  And I would ask Your Honor to take into

19    consideration the representations I made under seal with

20    respect to that statement and, kind of, see the point I'm

21    trying to make; that it puts into perspective a lot of this

22    man's behavior on January 6th.

23              Thank you.

24              THE COURT:  All right.  Very well.

25              Anything -- I've already heard from Mr. Jensen.

1    Any final points the Government wants to make?

2              MS. ALLEN:  No, Your Honor.  Thank you.

3              THE COURT:  All right.

4         So I have assessed the particular facts of this

5    case in light of the relevant 3553(a) factors, and I now

6    want to provide my thoughts for the record and for you,

7    Mr. Jensen, about my considerations in regard to the nature

8    of the offense, your history and characteristics, and all

9    the other factors that I have to consider.  So let's go

10   through them.

11             First, my considerations with regard to the nature

12   of the offense.  This is the hardest thing that I and many

13   of my colleagues have to grapple with in these cases -- in

14   many cases.  What happened that day was, in some way, as

15   serious an offense as there can be, given that it threatened

16   the peaceful transfer of power from one president to

17   another.  The damage that was done that day was both

18   tangible and intangible.  And although you didn't, sort of,

19   assault -- you didn't physically assault anyone that day by

20   touching them, you did play a big role in what happened that

21   day.  But first, let me talk about a few things about the

22   overall events of January 6th insofar as I have to consider

23   the nature and the circumstances of the offense.

24             Mr. Jensen, our Constitution and our laws give you

25   rights that people in other countries would do just about

1    anything for and that many Americans who came before all of

2    us have given their lives for.  You have the right to vote

3    for whoever you want to for president.  You have the First

4    Amendment right to speak out in favor of your candidate, to

5    put up signs to convince your friends and neighbors to vote

6    for that candidate.  If you don't like how an election is

7    being conducted, you can speak out about that, too.  You can

8    call; you can write; you can meet with elected officials in

9    your state or in the Federal Government.  You can try to get

10   election laws changed.  You can engage in peaceful protest.

11   And if you think you've been wronged and you have a case,

12   you can file a lawsuit in state or federal court, and many

13   candidates do that all the time.

14        But freedom means that with all of those rights

15   come responsibilities.  And so what you can't do -- what no

16   one can do under any circumstances -- is become part of a

17   mob that, using violence and the threat of violence,

18   disrupts Congress's ability to fulfill its role to process

19   the certification of the electoral vote for president.  But

20   that's what you did, and you, by your own acts, put yourself

21   at the forefront of that mob.  There was nothing patriotic

22   about it, and no matter how much you might not have liked

23   the way the process of electing our president was

24   proceeding.  And what happened that day not only damaged

25   property and injured people; it was a blow against the

1    customs and practices that help support the rule of law and

2    the Constitution.  It snapped our previously unbroken

3    tradition of a peaceful transfer of power, and we can't get

4    that back.  That's broken.

5          So the offense was more than extremely serious --

6    the events of the day, at least, were more than extremely

7    serious; they were a national disgrace, as I've said many

8    times before.  And your role, unfortunately for you, was not

9    a small one.  You anticipated that there would be violence

10   there.  There was evidence at trial that there were talk of

11   firearms.  So you came into the day's events anticipating

12   violence.  You didn't go so far -- as Mr. Davis has pointed

13   out, you didn't go so far as to wear a flak jacket and

14   helmet, but you did have a knife.  Didn't take it out of

15   your pocket.  That's true.  It was a knife -- I think it's

16   fair to say that the evidence at trial was that -- and the

17   representations are that it was a knife you carried commonly

18   with you.  So I didn't -- I don't take that too much -- I

19   don't weigh that too heavily, but you did have it.

20         You went through the extraordinary process of

21   scaling a wall outside the Capitol -- a, sort of, retaining

22   wall -- and climbing into the building through a broken

23   window.  You weren't like those folks who wandered in well

24   afterward.  I think the Government's memo said you were one

25   of the first 10 people into the building.  But in any event,

1    one of the very first.  You played -- once you were in

2    there, I can't say it other than any -- characterize it any

3    other way than you played a leading role in egging that mob

4    forward up the stairs against Officer Goodman and then into

5    the, sort of, interaction with the -- at the Ohio Clock

6    Corridor.  You waved them on.  You made it more likely that

7    others would do as you did by encouraging them to do so.

8    And, you know, as Inspector Lloyd said, you know, who knows

9    what would have happened if Officer Goodman didn't direct

10   you the other direction?  I mean, it is a miracle -- it is a

11   miracle -- that more people were not injured or did not lose

12   their lives that day, a miracle.  And what would have

13   happened if that group you led turned the other way into a

14   chamber full of senators?  God only knows.

15          Anyway, you chased Officer Goodman up the steps,

16   within steps of that Senate chamber, with senators still in

17   there.  The jury found that you assaulted Officer Goodman by

18   this contact -- by this conduct, even if there was no -- you

19   didn't initiate any contact between yourself and Officer

20   Goodman.  Then we have a similar standoff in the Ohio Clock

21   Corridor.  Again, you're waving a group of people forward.

22   You're encouraging them.  You are facing off directly with

23   the police and emboldening that mob.  When every officer

24   says, "You've got to leave the building; you've got to leave

25   the building," you're the one encouraging them, "No, we

 1    don't have to do that.  We're here for some other reason."

 2            And then after all that, you're removed from the

 3    building and you return to the building after all that.

 4    That's not enough.  You get -- you come back into the

 5    building; engage in a, kind of -- a scuffle with the police

 6    as they're trying to clear the rotunda.  You celebrated

 7    it -- you celebrated what happened afterward.  You took

 8    credit for what happened afterward.  And, you know, to be

 9    honest, your statement to me today did not suggest to me

10    that you, to this day, really understand why what happened

11    that day was wrong.

12            Mr. Davis has pointed out a lot of -- with all

13    those things I just went through that are -- don't weigh in

14    your favor at all, he's pointed out a lot of things that at

15    least do weigh in your favor.  You aren't -- while I do

16    think you -- it's clear the evidence showed you were leading

17    the mob that day -- you played a role in leading them,

18    there's no evidence that you planned extensively for that

19    day or, certainly, sort of, coordinated your actions with

20    people that ended up with you that day.  There was little

21    direct physical contact between you and anyone else.  You

22    did not use a weapon that day.  You yourself did not destroy

23    property.  All of those things matter, but still, on

24    balance, your role in what happened that day is -- it makes

25    what happened a serious offense by any measure.

```
 1              Then we turn to your characteristics as an
 2     offender.  That's the next thing I have to take into
 3     consideration.  You're 43 years old, married with three
 4     children.  You earned your GED.  You worked for many years
 5     in masonry before January 6th.  The parties have discussed
 6     some of your prior criminal conduct.  It's not very serious.
 7     Most of it is old except for the conviction for assault more
 8     recently, the one conviction.  And it doesn't -- the effect
 9     of all of it is such that it doesn't even raise your
10     criminal history category a level.  I have to take that into
11     consideration.  I mean, I think -- I don't take into
12     consideration some of the things the Government raised about
13     conduct that was never charged, conduct where the
14     circumstances are more -- is more unclear about who was
15     right and who was wrong.  I don't weigh that very much.  You
16     do have some substance abuse issues that are laid out.  I
17     won't go into them in great depth.  And there is mitigating
18     information about your life history and health that we
19     discussed under seal.  I think there seems little doubt that
20     played a role here.  I read it carefully before our hearing
21     today, I heard your lawyer talk about it, and I do take it
22     into consideration.  There's no doubt -- I'll just say, I
23     think in the absence of that information, the sentence I
24     would impose in this case would be significantly higher.  I
25     think probably the Government's request for sentence would
```

1    be -- have been significantly higher, but I can tell you my

2    sentence would be significantly higher.

3          You did go to the police.  You did identify

4    yourself and give a statement.  I don't know.  I don't see

5    that as a -- I didn't see, all in all, that was a true

6    confession.  In some ways, it seemed like you were using the

7    opportunity to try to get information from the FBI about

8    what they knew about QAnon and what -- and trying to use

9    your, sort of, newfound celebrity to get information from

10   them or to provide them information about this world view.

11   So I -- and I -- as I said, given what you said about

12   whether you would do it all again, I really don't take it as

13   a confession that much, even if parts of it were truthful.

14         And then I just want to pause for a moment and say

15   I received many, many letters on your behalf.  So you know,

16   I think -- and, really, a letter from your wife; letter from

17   other people in the community: neighbors, other relatives.

18   All of that matters.  The letters depict you as a valued

19   husband, a valued father, a valued neighbor, a valued member

20   of your community.  That all matters.  I felt like I got to

21   know you and know them very well through all the letters

22   that I read very carefully.  Those things do matter.

23         The next factor I have to -- the next thing I have

24   to factor in is the sentence has to reflect the seriousness

25   of the offense -- it has to reflect the seriousness of the

offense, promote respect for the law, and to provide just
punishment for the offense.  The sentence should also afford
adequate deterrence to criminal conduct, protect the public
from future crimes of the defendant, and promote
rehabilitation.  Look, I think all of these factors weigh in
favor of a significant sentence here.  And I think it's
obvious that respect for the law, just punishment for the
offense, and the seriousness of the offense would do that.
I also think, again, in terms of deterrence, certainly,
general deterrence is very important in all these cases.  We
cannot, as a country, have what happened on January 6th,
2021, happen again.  We cannot have it happen, you know?
Specific deterrence -- that is, deterrence to you,
Mr. Jensen -- is a little more of a tricky thing.  But,
again, I don't -- I wish I could say that I had evidence
before me that you really understood that this is not
something that can be repeated.  I know you want to go home.
I know you want this to be past you.  I get that.  But
that's different from saying -- telling me that -- in --
somehow that you understand that what happened that day can
never, ever happen again and why it was wrong.

Turning to the types of sentences available, which
is another thing I have to consider, the guidelines here are
57 to 71 months.  The Probation Office recommends 60 months.
The Government recommends 64 months.  I know, in your

1    counsel's sentencing memoranda, he advocated for 27 months

2    or, at least today, a substantial variance downward.

3            I also have to consider unwanted sentence

4    disparities.  I've looked closely at the cases the

5    Government has brought to my attention and other cases.

6            And I have to also consider the need to provide

7    restitution, which -- in which case -- in this case, the

8    Government is asking for $2,000.

9            So after considering all the 3553(a) factors and

10    considering what is sufficient but not greater than

11    necessary to comply with the purposes of sentencing, I am

12    going to sentence Mr. Jensen to 60 months' incarceration and

13    36 months' supervised release.

14            So Mr. Jensen, if you and your attorney can come

15    up to the podium, please.

16            I'll also just note before I begin, as I said

17    before, even if -- the two administration of justice

18    adjustments, even if they did not apply, my sentence would

19    be the same, and thus an upward variance after considering

20    all the 3553(a) factors.

21            So I will now impose the sentence which I

22    conclude, after considering all the 3553(a) factors, is

23    sufficient but not greater than necessary to comply with the

24    purposes of sentencing.

25            Pursuant to the Sentencing Reform Act of 1984 and

1    in consideration of the provisions of 18 United States Code

2    Section 3553 as well as the advisory sentencing guidelines,

3    it is the judgment of the Court that you, Douglas Austin

4    Jensen, are hereby committed to the custody of the Bureau of

5    Prisons for a term of 60 months which consists of concurrent

6    terms of 60 months as to Counts 1 through 5 and 6 months as

7    to Counts 6 and 7.  You are further sentenced to serve a

8    concurrent 36-month term of supervised release which

9    consists of 36 months as to Counts 1 through 5.  In

10   addition, you are ordered to pay a special assessment of

11   $520 in accordance with 18 United States Code Section 3013.

12   I will recommend that you be evaluated for mental health

13   treatment and placed in an appropriate facility that can

14   provide you that treatment.

15         While on supervision, you shall abide by the

16   following mandatory conditions as well as all the

17   discretionary conditions recommended by the Probation Office

18   in Part D sentencing options of the probation report which

19   are imposed to establish the basic expectations for your

20   conduct while on supervision.

21         The mandatory conditions include, one, you must

22   not commit another federal, state, or local crime.

23         Two, you must not unlawfully possess a controlled

24   substance.

25         Three, you must refrain from any unlawful use of a

1    controlled substance.  You must submit to one drug test

2    within 15 days of placement on supervision and at least two

3    periodic drug tests thereafter as determined by the Court.

4        You must cooperate in the collection of DNA as

5    directed by the probation officer.

6        You must make restitution in accordance with 18

7    United States Code Sections 3663 and 3663A or any other

8    statute authorizing a sentence of restitution.

9        You are ordered to make restitution to the

10   Architect of the Capitol in an amount of $2,000.

11   Restitution payments shall be made to the Clerk of the Court

12   for the United States District Court, District of Columbia,

13   for disbursement to the following victim.  The victim is the

14   Architect of the Capitol, Office of the Chief Financial

15   Officer, Ford House Office Building, Room H2-205B,

16   Washington, D.C. 20515.  The amount of loss is $2,000.

17       You shall comply with the following special

18   conditions:

19       Restitution obligation.  You must pay the balance

20   of any restitution owed at a rate of no less than $100 each

21   month.

22       Financial information disclosure.  You must

23   provide the probation officer access to any requested

24   financial information and authorize the release of any

25   financial information.  The Probation Office may share

1    financial information with the United States Attorney's

2    Office.

3         Financial restrictions.  You must not incur new

4    credit charges or open any additional lines of credit

5    without the approval of the probation officer.

6         Substance abuse testing.  You must submit to

7    substance abuse testing to determine if you have used a

8    prohibited substance.  You must not attempt to obstruct or

9    tamper with the testing methods.

10        Substance abuse treatment.  You must participate

11   in an in-patient or out-patient substance abuse treatment

12   program and follow the rules and regulations of that

13   program.  The program [sic] officer will supervise your

14   participation in the program as far as provider, location,

15   modality, duration, and intensity.

16        Mental health treatment.  You must participate in

17   a mental health treatment program and follow the rules and

18   regulations of that program.  The probation officer, in

19   consultation with the treatment provider, will supervise

20   your participation in the program in terms of, again, a

21   provider, location, modality, duration, and intensity.

22        Within 60 days of release from incarceration or

23   placement on supervision, you will appear before the Court

24   for a reentry progress hearing.  Prior to the hearing, the

25   probation officer will submit a report summarizing your

1    status and compliance with release conditions.  If you are

2    supervised by a District outside the Washington, D.C. area,

3    the United States Probation Office in that District will

4    submit a progress report to the Court within 60 days of the

5    commencement of supervision.  Upon receipt of the progress

6    report, the Court will determine if your appearance is

7    required.

8            I do find that you do not have the ability to pay

9    a fine and, therefore, I waive the imposition of a fine in

10   this case.

11           The financial obligations are immediately payable

12   to the Clerk of the Court of the U.S. District Court, 333

13   Constitution Avenue, NW, Washington, D.C. 20001.  Within 30

14   days of any change of address, you shall notify the Clerk of

15   the Court of the change until such time as the financial

16   obligation is paid in full.

17           The Probation Office shall release the presentence

18   investigation report to all appropriate agencies which

19   includes the United States Probation Office in the approved

20   District of residence.  In order to execute the sentence of

21   the Court, treatment agencies shall return the presentence

22   report to the Probation Office upon the defendant's

23   completion or termination from treatment.

24           Pursuant to 18 United States Code Section 3742,

25   you have a right to appeal the verdict and sentence.  If you

1    choose to appeal, you must file any appeal within 14 days

2    after I enter judgment.  And if you are unable to afford the

3    costs of an appeal, you may request permission from the

4    Court to file an appeal without cost to you.

5             Pursuant to D.C. Circuit opinion in United States

6    v. Hunter, 809 F.3d 677, decided on January 12th, 2016, are

7    there any objections to the sentence imposed that are not

8    already noted on the record?

9             Ms. Allen?

10            MS. ALLEN:  No, Your Honor.

11            THE COURT:  Mr. Davis?

12            MR. DAVIS:  No, Your Honor.

13            THE COURT:  All right.  Very well.

14            That concludes my judgment in this case.  Let me

15   just say a few other quick things.

16            Mr. Jensen, we've talked a lot about the fact that

17   you, through your actions on January 6th, were not a hero

18   and not a patriot, but I hope -- but I want to point out

19   that you -- like everyone else who comes through my

20   courtroom, you're not a monster either.  You made a serious

21   mistake, one that you're going to have to atone for, and you

22   played a significant role in a very black day for our

23   country, but I hope you don't lose sight of the fact that

24   you do have intrinsic worth as a human being.  You have a

25   loving wife and family.  You have many friends, people who

1    think highly of you.  You have a trade.  Your attorney's

2    spoke today and wrote of your raw intelligence and your

3    reading habit that days -- these days.  So I want you to

4    know that I hope -- no, more than hope -- I expect that on

5    the other side of this debt you have to pay for this

6    offense, that if you -- especially if you focus on your

7    health needs, that you should be able to rejoin your

8    community successfully on the other side of that.

9              I also want to say that I think the lawyers on

10    this case did an admirable and excellent job in representing

11    their clients on both sides, particularly Mr. Davis.

12              MR. DAVIS:  Thank you, Your Honor.

13              THE COURT:  Anything further from the Government?

14              MS. ALLEN:  Nothing further, Your Honor.

15              THE COURT:  Anything further from you, Mr. Davis?

16              MR. DAVIS:  Nothing further, Your Honor.  Thank

17    you.

18              THE COURT:  Ms. Harris, is there anything further

19    from you?

20              THE DEPUTY CLERK:  The Government's motion to

21    dismiss the pending counts in the original indictment and

22    the first superseding and second superseding.

23              THE COURT:  In the prior indictments?

24              THE DEPUTY CLERK:  Yeah, because if they don't put

25    it on the record, then --

```
 1                  THE COURT:  All right.
 2                  THE DEPUTY CLERK:  -- you can't dismiss them out
 3       of --
 4                  THE COURT:  Is the --
 5                  THE DEPUTY CLERK:  -- CM/ECF.
 6                  THE COURT:  All right.  Is there a motion from the
 7       Government to dismiss all the counts of all the prior
 8       indictments before the indictment for which Mr. Jensen was
 9       tried?
10                  MS. ALLEN:  Yes, Your Honor.  So moved.
11                  Thank you, Ms. Harris.
12                  THE COURT:  All right.  Thank you --
13                  THE DEPUTY CLERK:  You're welcome.
14                  THE COURT:  -- Ms. Harris.
15                  That motion is granted.
16                  And the parties are dismissed.
17                  THE DEPUTY CLERK:  All rise.  This Honorable Court
18       is adjourned.
19                  (Proceedings concluded at 10:54 a.m.)
20                  *  *  *  *  *  *  *  *  *  *  *
21                  CERTIFICATE OF OFFICIAL COURT REPORTER
22       I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify
23       that the above and foregoing constitutes a true and accurate
24       transcript of my stenographic notes and is a full, true and
25       complete transcript of the proceedings to the best of my
```

1    ability, dated this 26th day of June 2023.

2                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                               Official Court Reporter
3                              United States Courthouse
                               Room 6722
4                              333 Constitution Avenue, NW
                               Washington, DC 20001
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25